Christopher R. Dryden, Esq. (SBN 234476)
cdryden@attorneygl.com
James C. Huber, Esq. (SBN 269488)
jhuber@attorneygl.com
GLOBAL LEGAL LAW FIRM
380 Stevens Avenue, Suite 311
Solana Beach, CA 92075
Telephone:  (888) 846-8901
Facsimile:  (888) 846-8902

Attorneys for Defendant
U.S. ALLIANCE GROUP, INC.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DCR MARKETING, INC.,<br><br>      Plaintiff,<br><br>  vs.<br><br>U.S. ALLIANCE GROUP, INC.,<br><br>      Defendant. | Case No: 8:19-cv-01897-JVS-DFM<br>Case No: 8:20-cv-01280-JVS-DFM<br><br>Judge:   Hon. James V. Selna<br><br>**DEFENDANT/COUNTER-CLAIMANT U.S. ALLIANCE GROUP'S FINAL BRIEF** |
| U.S. ALLIANCE GROUP, INC., dba Alternative Payments International,<br><br>    Counter Claimant,<br><br>  vs.<br><br>DCR MARKETING, INC., and DIANA FLETCHER<br><br>    Counter Defendants. | |

///

///

///

///

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-8901

1

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-6901

# TABLE OF CONTENTS

Page

I. Introduction ........................................................................................... 1

II. Ms. Fletcher's Testimony Lacked Credibility ........................................ 1

III. DCRM was Set Up to Conceal Its True Business, and DCRM Also Directly Misrepresented Its True Business of Providing Unregistered Sub-Merchant Processing to Tribal Lenders .......................... 4

IV. Records and Documentation That DCRM Produced For The First Time In August 2019 (Albeit Incomplete) Buttress That It Had Misrepresented The True Nature Of Its Business When It Obtained The Merchant Account and That During Performance DCRM Breached the Agreement by Not Timely Disclosing Requested Information ............................................................................. 7

V. USAG's Involvement in Tribal Processing Does Not Discount that DCRM's Failure to Disclose Nested TLEs put USAG in Breach of its Agreement ...................................................................................... 10

VI. DCRM's Reference to Bank Statements Does Not Contradict that DCRM Mislead USAG Regarding Its Business ...................................... 10

VII. DCRM Used It's Merchant Account in Violation of Applicable Rules and Agreements, which Put USAG in Violation of the Rules and Its Agreements and Amounts to Transaction Laundering, a Form of Money Laundering .................................................................................. 12

VIII. DCRM's Misrepresentations Caused USAG to be in Violation of Its Bank Agreement .................................................................................... 14

IX. Blue Novis Also Engaged In Transaction Laundering .......................... 15

X. Blue Novis's Agreement with DCRM specifically absolved USAG, which Ms. Fletcher explained was the processor and/or acquirer of any liability and DCRM is required to Indemnify USAG under the USAG/DCRM Agreement................................................................... 18

XI. Blue Novis Did Not Establish Its Claim for Damages.......................... 18

XII. USAG Has Established Its Breach Of Contract Claim ......................... 20

    A.    USAG Has Established The Existence Of A Valid Agreement ................................................................................. 20

    B.    USAG Has Established Its Performance Under The Contract ................................................................................... 20

    C.    In Addition to the Above Acts that Also Support Fraud, USAG Has Established That DCRM Breached The Contract ................................................................................... 20

i

TABLE OF CONTENTS (cont.)

Page

1.  DCRM Failed to Perform Under §1.5 of the Agreement
    Terms and Conditions .................................................................. 20

2.  DCRM Failed to Perform Under §1.6 of the Agreement
    Terms and Conditions .................................................................. 22

3.  DCRM Failed to Perform Under §2.2 of the Agreement
    Terms and Conditions .................................................................. 22

4.  DCRM Failed to Perform Under Section 6.1 of the Debit
    Supplement ................................................................................... 23

D.  USAG Has Established That It Was Damaged .................................... 24

XIII.  USAG Has Established Its Promissory Fraud Claim Against DCRM .......... 25

A.  USAG Has Established The Misrepresentation By DCRM ............... 26

B.  USAG Has Established DCRM's Knowledge Of Falsity ................... 26

C.  USAG Has Established DCRM's Intent to Defraud .......................... 26

D.  USAG Has Established Its Justifiable Reliance ................................. 27

E.  USAG Has Established Resulting Damages ....................................... 27

XIV.  USAG Has Established Its Claim For Breach Of Contract Against
Ms. Fletcher ................................................................................................. 27

XV.  DCRM Cannot Establish Its Breach of Contract Claim Against
USAG ........................................................................................................... 27

A.  DCRM Cannot Establish That It Performed Under The
Contract ............................................................................................ 27

B.  DCRM Cannot Establish That USAG Breached the
Agreement ......................................................................................... 28

1.  DCRM Cannot Establish That USAG Breached the
Agreement by Not Returning the Funds in the
Reserve Account ......................................................................... 28

2.  DCRM Cannot Establish That USAG Breached the
Agreement by Terminating the Agreement
Immediately With Cause ............................................................ 28

C.  DCRM Cannot Establish That It Was Damaged ...................... 29

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-8901

ii

1  Defendant/Counter-Claimant U.S. Alliance Group, Inc. d/b/a Alternative
2  Payments International (hereinafter, "USAG") respectfully submits its final brief.

3  **I.   Introduction.**

4  USAG established at trial that both Blue Novis, Inc. (hereinafter, "Blue Novis")
5  and DCR Marketing, Inc. (hereinafter, "DCRM") were engaged in transaction
6  laundering, which is a form of money laundering, according to the applicable Card
7  Brand Rules.  This is true despite that the underlying transactions (here Tribal Lending)
8  are not *per se* illegal.

9  Any order that would require USAG to pay DCRM or Blue Novis related to
10 their transaction laundering activities would set a precedent that merchants could
11 legally hide the existence of sub-merchants.  This would completely undermine one of
12 the primary purposes of the only comprehensive rules and regulations that govern the
13 electronic payment processing ecosystem.

14 Notwithstanding the underlying impropriety of both DCRM's and Blue Novis's
15 business models, USAG established that DCRM breached its agreement with USAG
16 by concealing the true nature of its business, and failing to provide USAG with
17 information that would reveal that. USAG also established that, following a breach,
18 the Agreement with DCRM allowed USAG to terminate and charge an early
19 termination fee, and retroactively increase the rates.

20 Blue Novis failed to prove its causes of action because it could not show an
21 exact amount that it was owed, and its business model showed that it operated with
22 unclean hands due to that Blue Novis also engaged in transaction laundering.

23 Thus, USAG proved that its actions were justified under the agreement and that
24 it was damaged in the amount of $3,602,102.42 prior to offsetting from the Reserve
25 Account.

26 **II.   Ms. Fletcher's Testimony Lacked Credibility.**

27 The trial testimony of Ms. Diana Fletcher (the President of DCRM) lacked
28 credibility due to multiple contradictions. For instance, Ms. Fletcher stated that she

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(808) 846-6901

1

was not transacting business with Blue Novis when it was negotiating and began processing with USAG, including in May 4, 2018. (*See* Reporter's Transcript of Proceedings from 8/30/22 (hereinafter, the "8/30/22 R.T."), at pg. 18:9-23.). However, Ms. Fletcher then contradicted herself by testifying that DCRM was processing with Blue Novis back in 2017.  (*See* 8/30/22 R.T., at ppg. 18:19-24.)  Ms. Fletcher then tried to correct herself that there was a pause in their activity, (*see* 8/30/22 R.T., at pg. 18:15-16), but that testimony was inconsistent with the billing statements preferred by Blue Novis. (*See* Trial Exhibit (hereinafter each a "T.E.," or in multiples, the "T.E.s") 214, at Exh. 214-0001 and Exh. 214-0015.)

When first asked about merchant-level monitoring, Ms. Fletcher stated that she could monitor merchant risk daily via a report from Bridgepay. (*See* 8/30/22 R.T., at ppg. 32-33; 20:4).  Although, Ms. Fletcher stated that she was unsure if that report was provided in this action, she was likely referring to T.E. 70, an Excel spreadsheet which Ms. Fletcher testified was created by the processor.  (*See* 8/30/22 R.T., at pg. 34:3:9.) However, it was later shown that Ms. Fletcher manipulated that spreadsheet. (*See* Reporter's Transcript of Proceedings from 8/31/22 (hereinafter, the "8/31/22 R.T."), at ppg. 59:3-25; 60:21 to 61:5.) Mr. Fadi Cheikha (CEO of USAG) confirmed that Ms. Fletcher provided that spreadsheet. (*See* 8/30/22 R.T., at ppg. 158:24 to 160:3.) Ms. Fletcher also stated that DCRM brought on new customers all the time, and that each time it happened, it would notify USAG in writing via an email from Debra Lepage. (*See* 8/30/22 R.T., at pg. 42:9-24.) If any documents supported that allegation, they would largely exonerate DCRM, or at least destroy USAG's claims that DCRM was misleading USAG, and had any evidence of the sub-merchants other than the convoluted bank statement that was not submitted to confirm the identity of customers, but instead was provided to show DCRM's financial stability.  However, DCRM failed to introduce any documents to support that allegation.

On a related note, Ms. Preston testified that if USAG had to review every entity on a bank statement that was provided to show financial stability, the underwriting

DEFENDANT/COUNTER-CLAIMANT U.S. ALLIANCE GROUP'S FINAL BRIEF

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-8901

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(808) 846-6901

1  process would take months. (*See* Declaration of Keri Preston (ECF 257) (hereinafter,

2  the "Preston Dec.") at pg. 106:22-24.)

3      Ms. Fletcher testified that DCRM never held a reserve for any of its customers

4  (*See* 8/30/22 R.T., at ppg. 43:19:22.)  Ms. Fletcher then testified that DCRM held the

5  funds for three-to five days. (*See* 8/30/22 R.T., at ppg. 43-44; 23:8.) Ms. Fletcher also

6  admitted that Blue Novis sued DCRM for the return of reserves. (*See* 8/30/22 R.T., at

7  pg. 44:18-22.)  Ms. Fletcher also stated that she paid money out of the reserves.  (*See*

8  8/30/22 R.T., at pg. 50:19-22).  Ms. Fletcher also testified that DCRM paid Blue Novis

9  $968,784.05 as part of its settlement in the Canadian action, which, because Ms.

10 Fletcher stated that USAG was the only processor that DCRM used with Blue Novis,

11 and that she never held reserves and instantly paid those to sub-merchants, shows that

12 Ms. Fletcher lied about never holding merchant funds, as she must have been holding

13 these "net transaction proceeds" funds since only $600,154.39 was purportedly held

14 by USAG. (*See* 8/30/22 R.T., at pg. 73:3-10.)  Ms. Fletcher stated that she could not

15 remember why DCRM was holding $968,000 of Blue Novis's money. (*See* 8/30/22

16 R.T., at ppg. 81:10-12.)

17     This element also proves USAG's unjust enrichment claim because DCRM was

18 able to benefit from the relationship, and receive at least $968,000 which it held and

19 used for some unknown purpose.

20     Ms. Fletcher stated that DCRM's use of USAG was not hidden from Blue Novis.

21 (*See* 8/30/22 R.T., at pg. 47:14-21.)   However, Ms. Chimyere McCall (the Chief

22 Executive Officer of Blue Novis) maintained that she was never told about USAG's

23 involvement, or that there would be any third party processor (*See* Declaration of

24 Chimyere McCall (ECF 104) (hereinafter, the "McCall Declaration") at pg. 5:17-20.)

25     Ms. Fletcher's explanation of her agreement with Blue Novis, and the parties to

26 that agreement, showed that Ms. Fletcher attempted to explain the parties roles in terms

27 contradictory to her previous testimony. (*See* ppg. 59:21 to 60:19; 63:2-14.)

28     Ms. Fletcher's testimony is also contradicted by the subject matter of an Excel

spreadsheet containing a transaction history. (*See* Preston Dec., at ¶ 49, and T.E. 70, pages USAG EX 70-42 to 70-2665.) That spreadsheet confirmed that although DCRM processed some transactions under its prepaid payment card model, those transactions were approximately 1.8% of all the transactions DCRM processed, while the remaining 98.2% were attributable to DCRM's main business, which was related to Tribal Lending and other prohibited and high-risk transactions. (*See* Preston Dec., at ¶¶ 78 and 79, and T.E. 70, pages USAG EX 70-42 to 70-2665.) The fact that 1.8% of the transactions were related to DCRM's prepaid payment card model puts the lie to Ms. Fletcher's trial testimony that no prepaid cards processed through USAG. (*See* 8/30/22 R.T., at pg. 10:13-17.)

Ms. Fletcher's inconsistent statements between her declarations, trial testimony, and Ms. McCall's testimony, were pervasive and are highlighted further below.

### III. DCRM was Set Up to Conceal Its True Business, and DCRM Also Directly Misrepresented Its True Business of Providing Unregistered Sub-Merchant Processing to Tribal Lenders. This Proves USAG's Breach of Contract and Fraud Causes of Action

In or around May 2018, USAG received an application for payment processing services related to DCR Marketing, Inc. (hereinafter, "DCRM"), as well as additional documents and records related thereto, directly from Vantage Payments (hereinafter, "Vantage"). (*See* Preston Dec., at pg. 3:6-8.) That is consistent with the testimony of Ms. Fletcher, who informed the Court during trial that her knowledge was that Vantage shared everything with which it had been provided by DCRM to USAG. (*See* 8/30/22 R.T., at pg. 16:1-2.) Ms. Preston testified as to the documents that USAG received from Vantage in the Preston Dec. (*See* Preston Dec., at ¶¶ 8.a through 8.l (including 8.j and all subparts thereunder), and all T.E.s referenced therein.) The full set of documents that were received by USAG confirmed that DCRM only sold prepaid debit cards to large corporate clients. Those representations by DCRM, which are related to its representations to USAG that the processing services DCRM was seeking from USAG would be used for the TruCa$h prepaid card model, were itemized in evidence

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-8901

1   referenced in the Preston Dec. (*See* Preston Dec., at ¶¶ 71.a to 71.t (including ¶ 71.o

2   and all bullet-pointed items thereunder), and all T.E.s referenced therein.)

3          The foregoing documents included the letter from Ms. Josephine Pereira, dated

4   May 16, 2018. (*See* T.E. 69, at USAG EX 69-126 to 69-127.)  Ms. Fletcher testified at

5   trial that Ms. Pereira was an attorney for DCRM at the time of the letter, that the letter

6   accurately described part of DCR's business, and that the letter doesn't say anything

7   about Tribal Lending. (*See* 8/30/22 R.T., at ppg. 24:12-19.) Ms. Preston testified, with

8   respect to this letter, that USAG relied on Ms. Pereira's statements, as DCRM's

9   purported agent, to confirm DCRM's business model, which was issuing prepaid cards

10  related to notable NHL teams. (*See* Preston Dec., at ppg. 5:27 to 6:8.)

11         The foregoing documents also include the email from Ms. LePage, dated May

12  4, 2018. (*See* T.E. 69, at USAG EX 69-180.) Ms. Fletcher confirmed at trial that

13  DCRM provided this specific document to Vantage related to underwriting the USAG

14  account. (*See* 8/30/22 R.T., at pg. 16:15-23.) Ms. Preston testified that the information

15  in that email impacted USAG's understanding of DCRM's target market and business

16  model. (*See* Preston Dec., at pg. 7:5-10.) Ms. Preston also testified that Vantage

17  provided additional documents that validated Ms. Lepage's email. (*See* Preston Dec.,

18  at pg. 10:3-9 (referring to USAG EX 69-289 to 69-290); pg. 10:10-19 (referring to the

19  DCR Marketing Inc. "Corporate Overview," dated March 2018, USAG EX 69-291 to

20  USAG EX 69-305.)

21         In sum, USAG has established that the information and documents that DCRM

22  initially submitted in response to USAG's request for documents regarding its business

23  model were only those related to its prepaid card model, www.trucash.com. (*See*

24  Preston Dec., at pg. 93:8-10.)

25         After receiving documents from Vantage, USAG also pulled, or prepared,

26  numerous additional items related to its underwriting process that were identified in

27  the Preston Dec. (*See* Preston Dec., at ¶ 11.a through (including ¶ 11.k and all bullet-

28  pointed items thereunder, ¶ 11.p and all subparts thereunder, and 11.s and the subpart

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(808) 846-6901

thereunder) and all T.E.s referenced therein.) Several of those items further evidenced that the processing services DCRM was seeking from USAG would be used for the TruCa$h prepaid card model. (*See* Preston Dec., at ¶¶ 72.a to 72.k (including ¶ 72.a and all sub-parts thereunder, ¶ 72.g and all sub-parts thereunder, ¶ 72.i and all sub-parts thereunder, ¶ 72.k and all sub-parts thereunder), and all T.E.s referenced therein.)

Moreover, Ms. Preston testified at trial that her team searched the internet for information related to DCR and to TruCash, and that when her team conducted that search, it did not find any information related to Tribal Lending. (*See* 8/30/22 R.T., at ppg. 114:15 to 115:2.) That was to be expected based on Ms. Fletcher's testimony during trial that, at the time USAG and DCR entered into the processing agreement, there was nothing on either the TruCash or DCR website that advertised for Tribal Lending. (*See* 8/30/22 R.T., at pg. 13:4-8.) That illustrates how USAG's underwriters were unable to ascertain that DCR's business involved working with Tribal Lenders despite their review of DCR's and TruCash's websites.

In March 2019, USAG performed a periodic bank review of DCRM's merchant account. (*See* Preston Dec., at pg. 20:24-25.) No information was discovered during the periodic review of this information that indicated that DCRM was involved in any other business than selling prepaid cards. (*See* Preston Dec., at ¶¶ 13.a to 13.q, 14.a to 14.h, and all T.E.s referenced therein; *see also* Preston Dec., at pg. 27:19-22.)

It appeared that DCRM was specifically set up to mislead payment processors. Based on its and the TruCash websites, and all public facing material, DCRM represented that its primary business was selling prepaid cards. And later it was determined that less than 2% of the transactions under USAG were related to prepaid cards. (*See* T.E. 70, at USAG EX. 70-43.) Although Ms. Fletcher stated that there were zero prepaid card transactions, and she could not explain the why prepaid cards showed up on what she claimed was accounting provided by Bridgepay using information from USAG (*See* 8/30/22 R.T., at ppg. 10:13:17; p. 64:16-18; *see also* T.E. 70.) Mr. Cheikha, however, confirmed that the spreadsheet was not created by USAG or

DEFENDANT/COUNTER-CLAIMANT U.S. ALLIANCE GROUP'S FINAL BRIEF

BridgePay. Mr. Cheikha confirmed that the spreadsheet was manipulated by Ms. Fletcher, and the information on the file showed that it was created and last modified by Ms. Fletcher. (*See* 8/30/22 R.T., at ppg. 10: 13-17; 64:16-18.) It appeared that Ms. Fletcher again sought to mislead USAG, let alone the Court, by stating that T.E. 70 was a USAG or Bridgepay document, when in fact it was a document she created.

Blue Novis accepts the customer's debit card information over the phone from the customer. (*See* 8/31/22 R.T., at pg. 89:1-4, ppg. 90:25 to 91:9, ppg. 91:18 to 92-3, and pg. 92:13-23. *See also Id*., at pg. 91:10-13, pg. 92:4-8, and ppg. 92:24 to 93:3.) (*See also Id*., at pg. 91:14-17, pg. 92:9-12, and pg. 93:4-8.) This violates PCI compliance requirements set forth in the Card Brand Rules, as it leaves cardholder data susceptible to theft. DCRM's failure to understand the flaw in Blue Novis's business, and report that to USAG, also amounts to a material misrepresentation that put USAG in breach of its bank agreement, and the Card Brand Rules.

Thus, it appeared that DCRM was set up purposefully to hide its true business from underwriters.  Mr. Cheikha confirmed that Ms. Fletcher told him she was in the business for 35 years. (*See* 8/30/22 R.T., at pg. 140:23-24.) Thus it's easy to assume that someone with that experience would set up the business to secretly process transactions for sub merchants under her single merchant account.

These items confirm that DCRM breached the Agreement, made a material misrepresentation to USAG to induce it to enter into the agreement.  This also supports USAG's affirmative defenses against DCRM and Blue Novis because it justified USAG's assessment of an early termination fee that offset the amount that either party claims it was owed.

**IV.** **<u>Records and Documentation That DCRM Produced For The First Time In August 2019 (Albeit Incomplete) Buttress That It Had Misrepresented The True Nature Of Its Business When It Obtained The Merchant Account and That During Performance DCRM Breached the Agreement by Not Timely Disclosing Requested Information</u>.**

The Agreement sets forth that DCRM certified that all information provided

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-6901

DEFENDANT/COUNTER-CLAIMANT U.S. ALLIANCE GROUP'S FINAL BRIEF

1   during underwriting is accurate and true. (*See* T.E. 6, p. 4, section 1.5.) The Agreement

2   also required that DCRM will provide information upon request within 30 days or

3   sooner. (*See* T.E. 6, p. 4, section 1.6.)

4        Ms. Fletcher testified at trial that DCRM had seven sub-merchants when it

5   originally submitted its account to USAG. (*See* 8/30/22 R.T., at pg. 42:9-11.)

6   However, DCRM failed to provide any records or documentation for any of the sub-

7   merchants until August 2019. Additionally, upon USAG's request for information on

8   the sub-merchants, DCRM initially provided due diligence files for only five of the

9   sub-merchants with whom they had a relationship. (*See* Preston Dec., at ¶¶ 26-31, and

10  64.a.) DCRM had also not provided sufficient information/documentation with respect

11  to Blue Novis. (*See* Preston Dec., at ¶ 64.a.) DCRM only subsequently (after August

12  21, 2019) produced additional information/documentation with respect to Blue Novis,

13  and an additional due diligence file for Check Advance. (*See* Preston Dec., at ¶¶ 45,

14  all the subparts thereto, and all the T.E.s referenced therein, which pertain to Blue

15  Novis; 46, all the subparts thereto, and all the T.E.s referenced therein, which pertain

16  to Check Advance; and 64.b.) By the time DCR produced all the foregoing items, more

17  than 30 days had passed since Ms. Fletcher represented on July 16, 2022, that DCRM

18  "prepared to give you what ever documents you need". (*See* Preston Dec., at pg. 30:13-

19  16, and T.E. 95, at USAG EX 95-76.)

20       Also, although DCRM provided records related to two additional sub-

21  merchants, National Small Loan and Arrowhead Advance, those records were limited

22  to DCRPay Statements. (*See* Preston Dec., at ¶¶ 47 and 48, all subparts thereto, and all

23  T.E.s referenced therein.) DCRM failed to ever provide due diligence files for National

24  Small Loan or for Arrowhead Advance. (*See* Preston Dec., at ¶ 50.b.) DCRM failed to

25  ever do so despite the fact that USAG requested those files multiple times, and DCRM

26  personnel (such as Mr. Nelson Shehaj) promised to provide those files. (*See* Preston

27  Dec., at ¶¶  43 and T.E. 70, at USAG EX 70-33 (a promise from Ms. Fletcher in

28  particular); 58 and T.E. 96, at USAG EX 96-68; 59 and T.E. 96, at USAG EX 96-67

8

and 96-68; 61 and T.E. 96, at USAG EX 96-67.)

Furthermore, DCRM failed to provide certain documents and records related to some of the sub-merchants *until after the initiation of this case, and in response to discovery requested from USAG*. (*See* Preston Dec., at ¶ 67, all subparts thereto, and all T.E.s referenced therein.) (*See* Preston Dec., at ¶ 68, all subparts thereto, and all T.E.s referenced therein, pertaining to sub-merchants Arrow One LLC, FSST FINANCIAL SERVICES, LLC d/b/a Aspen Peak Financial, and Axis Advance, LLC.)

In light of the foregoing, Ms. Fletcher's trial testimony that DCRM supplied Vantage with "information on sub-merchants" is clearly false. (*See* 8/30/22 R.T., at pg. 16.1-4.) DCRM failed to proffer, or even identify, any evidence that supports that assertion.  At trial, Ms. Fletcher testified she is familiar with everything that DCRM provided to Vantage. (*See* 8/30/22 R.T., at pg. 16:8-10.) However, when she was asked exactly what DCRM provided to Vantage, Ms. Fletcher could only refer to an "e-mail" that she failed to identify. (*See* 8/30/22 R.T., at pg. 16:11-13.)

The Court should disregard Ms. Fletcher's testimony, as it lacks any credibility whatsoever. For example, in her written trial declaration (ECF No. 268) (hereinafter, the "Fletcher Declaration"), she testified: "I instructed Ms. LePage that DCR was looking for a relationship that could include <u>all of DCR's business, including pre-paid debit cards</u>, and merchant processing transactions undertaken by DCR on behalf of its customers, including those in the field of tribal lending." (Emphasis added.) (*See* Fletcher Declaration, at ppg. 2:27 to 3:2.) However, at trial, Ms. Fletcher stated that she instructed Ms. LePage to find a source only for Tribal Lending. (Emphasis added.) (*See* 8/30/22 R.T., at pg. 10:5-12.) And as set forth above, Ms. Fletcher stated that she did not process any prepaid cards, when her own record, T.E. 70, showed that she did process prepaid card transactions. The foregoing discrepancy between Ms. Fletcher's written and oral testimony begs the question of whether she was being untruthful in the Fletcher Declaration, and/or when she testified at trial.

///

DEFENDANT/COUNTER-CLAIMANT U.S. ALLIANCE GROUP'S FINAL BRIEF

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-8901

## V.     USAG's Involvement in Tribal Processing Does Not Discount that DCRM's Failure to Disclose Nested TLEs put USAG in Breach of its Agreement.

DCRM introduced an "impeachment" exhibit at trial that had never been disclosed regarding that USAG had been engaged in processing ACH transactions for tribal entities. (*See* 8/30/22 R.T., at ppg. 143:22 to 145:17.) Mr. Cheikha explained that USAG was involved in ACH processing, which was a separate business that was different from DCRM boarding Tribal Lending Entities ("TLEs") under a debit program.  Ms. Preston testified that USAG was a reseller for Tribal, it was not under USAG's banking relationship. (*See* 8/30/22 R.T., at ppg. 120:1 to 121:5.) Mr. Cheikha confirmed that USAG did not solicit Tribal Lending entities for the debit program due to the inherent risks and that it was prohibited by its bank. (*See* 8/30/22 R.T., at pg. 138: 22-24).

## VI.    DCRM's Reference to Bank Statements Does Not Contradict that DCRM Mislead USAG Regarding Its Business.

DCRM presented evidence of bank statements that DCRM provided to USAG during the initial underwriting process. Ms. Preston confirmed that the statements were provided only to verify the financial condition of DCRM. (*See* Preston Dec., at pg.13 ¶ 11(c); 18:15-21, referring to T.E. 69, at USAG EX 69-441 to 69-480.) Further, Ms. Preston and Mr. Cheikha confirmed that if they were required to scrutinize all material in bank statements that it would add weeks to the underwriting process and make underwriting too burdensome to ever board a merchant.  Merchants would get tired of waiting and would find a competitor.  (8/30/22 R.T., P 98, 1:9; 10;23.  p. 98-99, 25;4; 111-112, 4:2; 118; 7:14; (8/10/22 Preston Dec'l p 106-107, ¶ 76.)

DCR's counsel's attempts to create the impression that USAG's underwriters missed references to DCR's sub-merchants even thought they were highlighted on the statement – but statements provided USAG were not highlighted.  DCR's counsel highlighted those transactions. 8/30/22 R.T., P 97, 1:3.)

Furthermore, even with respect to any sub-merchants which were the subject of

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-6901

1 certain withdrawals in the bank statements, which USAG may have familiar with,
2 those withdrawals would not have raised any red flags during the underwriting process.
3 That is particularly the case because of DCRM's representations that its business was
4 related solely to TruCash and prepaid cards, but also because DCRM failed to provide
5 any information or documents to indicate that DCRM planned to process transactions
6 on behalf of those sub-merchants. For all USAG knew, those sub-merchants could
7 have been vendors or customers of DCRM's – USAG had no reason to believe
8 otherwise based on the records and documentation that it received from Vantage.
9 Finally, if USAG was required to question each line item on a bank statement, the
10 underwriting process would take months. (*See* Preston Dec., at pg. 106:22-24.)

11     Regardless, USAG did not review these items and question DCRM related to
12 what each entity did.  That may have proved useless too as Ms. Fletcher could not say
13 which entity was a tribal lender that processed under DCRM's agreement with USAG
14 8/30/22 R.T., P 28, 1-5).  For example, Ms. Fletcher did not know if FSST was a sub
15 merchant.   8/30/22 R.T., P 27, 17-22; and Ms. Fletcher did not know if SGM
16 Consulting, was a sub merchant.   8/30/22 R.T.,  P 27, 23-25; p. 28; 18-23.  Thus, has
17 USAG asked DCR, it apparently would have gotten the answer that MS. Fletcher
18 stated at trial, which was that she did not know.

19     At best, USAG was negligent in not catching these sub-merchants.  But that
20 does not undercut that when USAG did discover it, it terminated the agreement due to
21 the underlying impropriety and Rules violations, nor that DCRM misstated the true
22 nature of its relationship.

23     Finally, while being examined by the Court with respect to T.E. 23, page 23-5[1],
24 the following exchange took place with Ms. Preston:
25 "THE COURT: Okay. But you were provided the names of Tribal lenders that Blue Novis was doing business with, correct?
26 THE WITNESS: I mean, we received documentation during –
27

28 [1] This same page is included in T.E. 69, at USAG EX 69-445.

11

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-6901

THE COURT: No, no, no. You received notice that Blue Novis was dealing with Tribal lenders, did you not, whether it was followed up or not?

THE WITNESS: Yes." (*See* 8/30/22 R.T., at pg. 118:7-23.)

The foregoing exchange gives the impression that USAG was on notice, during the initial underwriting period, that Blue Novis was doing business with TLEs, but it seems likely that the Court meant to refer to DCRM.  However, that clearly was not the case, as since even if  this bank statement could possibly be interpreted to have given USAG notice that DCRM was "dealing with tribal lenders," it would not have given USAG notice that Blue Novis was dealing with, or doing business with, TLEs. That is because although page 23-5 refers to Blue Novis with respect to a withdrawal on April 24, 2018, in the amount of $11,763.10, it does not include any additional information re any TLEs with which Blue Novis was dealing with or doing business with. That includes Niizhwaaswi, LLC and Ningodwaaswi (the two tribal lenders about which Ms. McCall testified extensively).

## VII.   DCRM Used It's Merchant Account in Violation of Applicable Rules and Agreements, which Put USAG in Violation of the Rules and Its Agreements and Amounts to Transaction Laundering, a Form of Money Laundering.

The Card Brand Rules require that all participants in the network comply with the Card Brand Rules.  This includes all parties to this lawsuit.  (*See* Declaration of Fadi Cheikha (ECF No. 256) (hereinafter, the "Cheikha Dec."),  at p. 12-13 ¶ 37-40; T.E.s 76, 78.)

Mr. Cheikha explained that one of the primary goals of the Card Brand Rules is to prohibit transaction laundering, where merchants mask transactions from sub-merchants to make them appear as their own (*See* Cheikha Dec. p. 4 ¶ 14; ppg. 14-18 ¶ 41-43; T.E.s 76, 78).  Mr. Cheikha also explained to the Court in detail how the nested merchants was illegal laundering despite that the underlying transaction was not *per se* illegal. (*See* 8/31/22 R.T., at ppg. 15-17:12- 22)

Mr. Cheikha explained in his declaration in and testified at trial how that when he reviewed the file, he found that DCRM had violated the applicable rules and that

12

1   based on that impression and understanding, he sent the termination letter to DCRM.

2   (8/30/22 R.T. at ppg. 128:19 to 129:2, p. 145:17 to 146:1; p. 153:12-13; p. 155:17-19;

3   See T.E. 70-29 through 70-34.)

4        In his declaration, Mr. Cheikha confirmed that DCRM's conduct violated the

5   applicable rules of Visa and MasterCard, and that the violations could cause fines and

6   penalties, including not being allowed to conduct business. *See* Cheikha Dec. ppg. 14

7   -18¶¶41 - 43; ¶130, ¶132.

8        Ms. Fletcher admitted that her sub-merchants, including Blue Novis were

9   required to comply with the card brand rules.   (*See* 8/30/22 R.T., at ppg. 61:2-4.)

10       DCRM violated the Rules as follows.  First, USAG established at length that

11  both Blue Novis and DCRM were processing transactions on behalf of third parties of

12  which neither DCRM nor Blue Novis provided any good or service for the transaction

13  by the cardholder.  And under the Rules, a merchant may only deposit transactions for

14  its own business and that Visa characterizes this as laundering" a form of fraud.. (*See*

15  *e.g.,* Cheikha Dec., at p. 15, ¶ 41.(b)(i).*; See* USAG EX 247-54; *see also.,* Cheikha

16  Dec., at p. 15, ¶ 41.*a.; See* USAG EX 247-42 to USAG EX 247-118.

17       Ms. Fletcher tried to state that she was a "Payfact," which is likely due to Ms.

18  Fletcher reading the previous declaration in this case where USAG established that the

19  applicable Card Brand Rules stated that only Payment Facilitators could process

20  transactions on behalf of sub-merchants. *See e.g.,* Cheikha Dec., at p. 15-16, ¶ 41.(b)(i-

21  ii)a.; Cheikha Dec. p. 30 ¶ 73-75, 77;  *see* USAG EX 247-120 to USAG EX 247-203;

22       But even under a PayFac, that the processor (here USAG) they had to know of

23  all the sub entities and have  a direct agreement. (*See* 8/30/22 R.T., at ppg. 132:25 to

24  133:2.)  USAG established that DCRM did not arrange for USAG to have a direct

25  agreement with its sub-merchants, including Blue Novis. (*See* 8/30/22 R.T., at pg.

26  55:13-15.)

27       Mr. Cheikha testified that processing TLEs on debit transactions violated the

28  Card Brand Rules. (*See* 8/30/22 R.T., at pg. 145:13-19.)

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(808) 846-6901

13

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-6901

Mr. Cheikha also testified that he terminated DCR due to its violation of the Card brand Rules.  (*See* 8/30/22 R.T., at ppg. 157:7-12).  Those reasons included that DCRM was nesting transactions, and layering merchant accounts without being a registered PayFac.  (*See* 8/30/22 R.T., at ppg. 157:17 to 158:17; *see also* 8/31/22 R.T., at ppg. 19:25 to 20:7.) In fact, Ms. Fletcher confessed in an email to Ms. Preston, dated September 4, 2019: "We don't have anything on these two clients as they are on native land and on boarded them years ago, and can't find the paperwork." (*See* Preston Dec., at ¶ 62:21:24; *see also* T.E. 96, page USAG EX 96-67.)

Mr. Cheikha also testified that if USAG did not know of the underlying merchant, even if it was a Ralph's, it would create an illegal situation due to transaction laundering.  (*See* 8/30/22 R.T., at ppg. 165:17 to 166:24.)

Ms. Fletcher testified that her sub-merchants did not have a direct agreement with USAG. (*See* 8/30/22 R.T., at ppg. 55:13-15.) Ms. Fletcher also testified that when she moved processors, she would not execute a new agreement. (*See* 8/30/22 R.T., at ppg. 26:17-18; 58:23-24; *see also* T.E. 78, at USAG EX. 78-120, 78-121, 78-135, and 78-1168.)

Ms. Fletcher states that she though she was a "Payfact".  Ms. Fletcher did not present any evidence showing that she was a registered Payfac. Moreover, Ms. Preston testified that the "Visa's Global Registry of Service Providers" shows that DCRS was a third party agent, meaning that it only performed solicitation services for prepaid cards and other cardholders, but certainly was not a payment facilitator, which would have shown up on this report if such registration existed at the time. (*See* Preston Dec., at ppg. 8:26 to 9:7 (referring to T.E. 69, at USAG EX. 69-250.)

The Rules state that a Payfac or registered ISO must monitor risk.  (*See* Cheikha Dec. p. 4; ¶ 12; p 5; ¶ 18; p. 30; ¶ 74.) Ms. Fletcher testified that DCRM did not monitor risk because that was the processor's job.  (*See* 8/30/22 R.T., at ppg. 31:24 to 32:18.)

## VIII.  <u>DCRM's Misrepresentations Caused USAG to be in Violation of Its Bank Agreement</u>

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-6901

1   Mr. Cheikha and Ms. Preston testified that based on their review of the file,

2   DCRM was processing for TLEs, and that DCRM had those merchants "nested," and

3   that USAG's agreement with Evolve prohibited both TLEs and nested merchants.  (*See*

4   Cheikha Dec. p. 26; ¶ 71 (a)(ii); *see also* Preston Dec. p 2-3, ¶ 3, and T.E. 100, at

5   USAG EX 110-1A.)

6   **IX.    Blue Novis Also Engaged In Transaction Laundering.**

7   The Analysis of Blue Novis's rules violations is similar to that of DCRM since

8   both entities were largely involved in the same business, which was allowing sub-

9   merchants to process transactions under their merchant account.   The difference

10  between Blue Novis and DCRM is that Blue Novis did not seek to hide its business

11  process at trial or apparently when it engaged DCRM.  That does not undermine that

12  USAG did not know nor that the underlying activity was prohibited and that USAG

13  therefore could not assist or facilitate that activity, otherwise it would be an accomplice

14  and likely put itself under scrutiny for Card Brand violations, at a minimum.

15  At trial, Ms. McCall testified that Blue Novis operated on behalf of a Tribal

16  Lending Entity named Ningodwaaswi and a Tribal Lending Entity named Niizhwaaswi,

17  LLC (hereinafter with Ningodwaaswi, "the BN TLEs"). (*See* 8/31/22 R.T., at ppg. 81:6

18  to 82:14.) Ms. McCall also testified that the BN TLEs both offered consumer loans,

19  both engaged Blue Novis to take inbound calls and receive payment on behalf of the

20  BN TLEs, and that the BN TLEs customers did not have direct agreements with Blue

21  Novis and that Blue Novis did not provide any goods or services to those customers.

22  (*See* 8/31/22 R.T., at ppg. 83:18 to 84:3; 84:4-11;85:1-9; 85:10-19 96:23 to 97:12;

23  97:13-23.)  (*See* 8/31/22 R.T., at pg. 84:12-21.)  Blue Novis never provided a good to

24  the cardholder, or a service to the cardholder. (*See* 8/31/22 R.T., at ppg. 96:23 to

25  97:12.) For all of the reasons set forth above, this shows that Blue Novis was engaged

26  in transaction laundering, which was prohibited by the rules, and any amount of

27  research will also show that this amounts to money laundering.

28  Ms. McCall testified that, both before and after Blue Novis entered into the DCR

15

1   Agreement, Blue Novis operated the same way. (*See* 8/31/22 R.T., at ppg. 93:25 to
2   94:5, pg. 95:18-24, pg. 94:15-21, ppg. 95:25 to 96:6, and pg. 93:9-19.)

3        Ms. McCall understood and agreed that Blue Novis was required to comply with
4   all anti-money laundering laws and regulations, including the Bank Secrecy Act, the
5   US Treasury's Office of Foreign Assets Control (OFAC) and the Federal Trade
6   Commission. (*See* T.E. 211, page 209-0015.)  Mr. Cheikha testified that DCRM was
7   in violation of BSA and AML laws. (*See* 8/31/22 R.T., pg. 22:15-23.)

8        Blue Novis's improper conduct described above is even worse considering it
9   was done intentionally, or Ms. McCall had constructive knowledge that the conduct
10  described above was improper since Ms. McCall confirmed that she read and
11  understood, "Intuit Payments Merchant Agreement" (hereinafter, the "Intuit
12  Agreement" T.E. 211). (*See* 8/31/22 R.T., at pg. 74:11-23.)  Intuit was Ms. McCall's
13  processor before and while she processed with DCRM.

14       Section 4 of the AUP, titled "Prohibited Transactions," that states that, in
15  addition to the prohibited payment processing or other money movement transactions
16  or practices listed in the terms of the Services, Blue Novis agrees not to use the
17  Services in connection with processing transactions for another business other than the
18  one whose information has been underwritten. (*See* Declaration of Fadi Cheikha (ECF
19  267) (hereinafter, the "Cheikha Rebuttal Dec.", Section 4, at pg. 16:10-14, and 16:21-
20  22.) Mr. Cheikha also testified that when he clicked on the link to that agreement (the
21  Commercial Entity Agreement), that agreement states that the Merchant (i.e.. Blue
22  Novis) agrees to comply with all Card Brand Rules, including not submitting any
23  Transactions that are not bona fide Transactions, not requesting or using Card
24  Information for any purpose except as payment for its goods or  services, not using the
25  Card Information for any purpose that it knows or should know to be fraudulent or in
26  violation of any Card Brand. (*See* Cheikha Rebuttal Dec., Section, 1.2, at ppg. 18:19
27  to 19:10.)

28       Ms. McCall also understood and agreed that Blue Novis agreed to use the

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-8901

DEFENDANT/COUNTER-CLAIMANT U.S. ALLIANCE GROUP'S FINAL BRIEF

Services in a manner that is consistent with all rules and operating regulations issued from time to time by the credit card networks (i.e. VISA, MasterCard, American Express, JCB, Discover, Apple Pay, etc.); the Payment Card Industry, and other similar entities. (*See* T.E. 211 at Section 20, page 211-0007.)

Ms. McCall also understood and agreed that Blue Novis may not present for processing or credit, directly or indirectly, any transaction not originated as a result of a payment transaction directly between it and a payor, and may not accept or deposit any fraudulent transaction and may not present for processing or credit, directly or indirectly, a transaction which originated with any other merchant or any other source." (*See* T.E. 211 at Section 21, page 211-0007.) Ms. McCall also understood and agreed that Blue Novis must also obtain a customer's or payor's authorization via methods acceptable in accordance with the Rules prior to completing any card or payment transaction." (*See* T.E. 211 at Section 27, page 211-0010.)

Ms. McCall testified that under her Agreement with DCRS, and agreed that Blue Novis was required to comply with all rules relating to all card schemes for card-not-present transactions that they accept including requirements specific to the regions in which they operate. (*See* T.E. 211 at Section 5.1.2, page 209-0004.)

Ms. McCall understood and agreed that Blue Novis was required to fully comply with any and all anti-money laundering laws and regulations, including but not limited to the Bank Secrecy Act, the US Treasury's Office of Foreign Assets Control (OFAC) and the Federal Trade Commission. (*See* T.E. 211, page 209-0015.)

Ms. McCall understood and agreed that Blue Novis was required to only complete sales transactions produced as the direct result of bona fide sales made by Sub-merchant to cardholders. (*See* T.E. 211, page 209-0015.) Ms. McCall also understood and agreed that Blue Novis was expressly prohibited from presenting sale transactions which are produced as a result of sales made by any person or entity other than Sub-merchant, or for any purposes related to any illegal or prohibited activity, including but not limited to money-laundering or financing or terrorist activities. (*See*

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-6901

17

1  T.E. 211, page 209-0015.)

2       Since Blue Novis failed to comply with the foregoing, it is in breach of its

3  agreement with DCR. As a result of that breach, Blue Novis is unable to enforce its

4  rights. Moreover, it is clear that Blue Novis came to the transaction and operated under

5  its agreement with DCRM fully aware that its business violated the applicable rules

6  and regulations.  Thus, Blue Novis had unclean hands, and was equally or more in the

7  wrong that the other parties of which she complained.

8  **X.    Blue Novis's Agreement with DCRM specifically absolved USAG, which**
**Ms. Fletcher explained was the processor and/or acquirer of any liability**
9  **and DCRM is required to Indemnify USAG under the USAG/DCRM**
**Agreement.**
10

11       Ms. Fletcher testified that under her agreement with Blue Novis, USAG was the

12  acquirer,  (*See* 8/30/22 R.T.  p. 59:19 through 25; *see also* T.E. 209-1 through 209-17;

13  p. 62:13-21; *see also* T.E. 209 at p. 16 limitation of liability.

14       Thus, USAG has no liability to Blue Novis under DCRM's Agreement. Further,

15  USAG's Agreement requires DCRM to indemnify USAG against all claims.  DCRM

16  has not provided that indemnity.  8/31/22 R.T. p. 31:15-24; p. 62:11–16.)

17  **XI.   Blue Novis Did Not Establish Its Claim for Damages.**

18       Blue Novis's Agreement with DCRM specifically absolved USAG, which Ms.

19  Fletcher explained was the processor and/or acquirer of any liability.

20       Blue Novis failed to establish the amount that USAG held in Reserve.  There

21  was no evidence of the amount that USAG ever held.  (*See* 8/31/22 R.T., at ppg. 37:2-

22  25) because Blue Novis could not prove the amount that USAG had to offset for

23  chargebacks.) Moreover, During the trial on August 31, 2022, Ms. McCall was asked

24  to turn to paragraph 7 of her declaration. (*See* 8/31/22 R.T., at ppg. 102:23-24.) Ms.

25  McCall testified that Blue Novis is seeking $600,154.39 in reserve funds related to

26  what Ms. McCall referred to as Blue Novis-initiated transactions.(*See* 8/31/22 R.T., at

27  ppg. 102:25 to 103:3.)

28       Ms. McCall admitted that her processing statements showed that the reserves in

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-6901

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-6901

question had already been released. (*See* ppg. 105:21 to 106:13, and T.E. 214, at page Exh. 214-0060 (referring to reserve returned in the amount of $13,356.59); *see also* ppg. 108:21 to 109:2, and 109:16-25, and T.E. 214, at page Exh. 214-0061 (referring to reserve returned in the amount of $14,312.87); *see also* ppg. 113:24 to 114:14, and T.E. 214, at page Exh. 214-0062 (referring to reserve returned in the amount of $14,297.09.)

Although Ms. McCall testified that none of those reserve amounts had been returned to Blue Novis, her testimony is in conflict with Ms. Fletcher's. That is because Ms. Fletcher testified at trial that DCRM had used approximately $100,000.00 of its own funds to pay back some of Blue Novis's reserves, which was credited towards Blue Novis's reserves. (*See* 8/30/22 R.T., at ppg. 50:19 to 51:5 and 80:5-7.)

Ms. Fletcher's trial testimony makes sense when you consider not only the foregoing three examples, but the following three additional examples of the same circumstances:

- T.E. 214 includes Billing Statements 46 and 72, which shows that reserves in the amount of $18,865.40 were retained and then released. (*See* T.E. 214, at pages Exh. 214-0037 and 214-0063.)

- T.E. 214 includes Billing Statements 47 and 73, which shows that reserves in the amount of $17,583.10 were retained and then released. (*See* T.E. 214, at pages Exh. 214-0038 and  Exh. 214-0064.)

- T.E. 214 includes Billing Statements 48 and 74, which shows that reserves in the amount of $21,376.00 were retained and then released. (*See* T.E. 214, at pages Exh. 214-0039 and Exh. 214-0065.)

In short, Blue Novis's own evidence (i.e., T.E. 214) shows that even if certain amounts of reserves were withheld initially, **a total of $99,791.05 of those reserves were subsequently released to Blue Novis**. As such even if the Court awards damages to Blue Novis, those damages should exclude that $99,791.05, or else Blue Novis would essentially receive those damages twice.  While this helps Ms. Fletcher's unsupported argument, Ms. Fletcher did not testify as to the exact amount nor show

any records.  Thus, this only shows that neither DCRM nor Blue Novis can show an accurate amount of damages.  Further, it is simply implausible that information in the billing statements regarding the amount of reserves supposedly withheld is correct, while other information in the billing statements regarding the release of the same reserves is incorrect.

**XII.**   **USAG Has Established Its Breach of Contract Claim.**

   **A.**   **USAG Has Established The Existence Of A Valid Agreement.**

It is undisputed that a valid contract exists (i.e., the Agreement) (*See* T.E. 6.)

   **B.**   **USAG Has Established Its Performance Under The Contract.**

Under the Agreement, USAG agreed to provide certain payment processing services to DCRM to allow DCRM to process transactions related to its disclosed business model (i.e., TruCash and prepaid cards). (*See* Preston Dec., at ¶ 9, and USAG EX 69-188 to USAG EX 69-195[2]) USAG also established DCRM's USAG Merchant Account, and provided electronic payment processing services to DCRM solely related to DCRM's sale of TruCash and prepaid cards. $279,267.56 of the transactions processed through the USAG Merchant Account were attributable to TruCash. (*See* T.E. 70, at USAG EX 70-43.) As such, USAG performed all terms, conditions, covenants, and promises required of it under the Agreement, except those that have been discharged, excused, waived, or prevented.

   **C.**   **In Addition to the Above Acts that Also Support Fraud, USAG Has Established That DCRM Breached The Contract.**

      **1.**   **DCRM Failed to Perform Under §1.5 of the Agreement Terms and Conditions.**

Pursuant to Section 1.5 of the Agreement Terms and Conditions ("§1.5"), DCRM represented and warranted to USAG that all information, data, and statements contained in, or submitted with, the Application are true, correct, and complete. (*See* T.E. 6.)  DCRM's non-disclosure of the existence of its sub-merchants, and the nature

---

[2] For the Court's convenience, these pages are the same as T.E. 6.

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-6901

of their respective businesses, the information, data, and statements contained in, or submitted with, the Application were not true, correct, and complete. Instead, DCRM disclosed that its business practices exclusively involved the sale of TruCash and prepaid cards, and directed USAG to the TruCash website to review its business operations.  That website did not include any information on TLEs. (*See* 8/30/22 R.T., at pg. 13; 4-13.)  Ms. Fletcher did not remember if there was any marketing material that advertised DCRM's true business nature.  (*See* 8/30/22 R.T., at ppg. 13:15-18.)

DCRM did not disclose that it intended to aggregate and submit for processing through its USAG merchant account the sub-merchants' Tribal Lending transactions, or act as an unauthorized Payment Facilitator ("PayFac") and commit potential crimes.  However, approximately 98.2% of the transactions processed through DCRM's merchant account were attributable to DCRM's main business (*see* T.E. 70, at USAG EX 70-43), which was related to Tribal Lending and other prohibited and high-risk transactions as set forth above.

The foregoing analysis is underscored by the DCRPay processing statements DCRM generated and sent to the sub-merchants, which demonstrably show that the information, data and statements provided by DCRM to Vantage, and then to Vantage, were incomplete, incorrect or false. They also clearly reflect DCRM was aggregating and submitting transactions through its USAG merchant account i.e., acting as an unauthorized PayFac, and substantially marking up those transactions. (*See* T.E.s 86, at USAG EX 86-147 to USAG EX 86-198; 89, at USAG EX 89-172 to USAG EX 89-221; 90, at USAG EX 90-192 to USAG EX 90-241; 91, at USAG EX 91-134 to USAG EX 91-183; 94, at USAG EX 94-1 to USAG EX 94-53; 88, at USAG EX 88-77 to USAG EX 88-126; 87, at USAG EX 87-16 to USAG EX 87-61; 92, at USAG EX 92-1 to USAG EX 92-72; and 93, at USAG EX 93-1 to USAG EX 93-48 (hereinafter collectively, the "Statements".)

The Statements further reflect that at the time the Parties' entered the Agreement, USAG and/or its Processing Partners were funding proceeds resulting

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-6901

from the sub-merchant transactions to DCRM i.e. (it took possession of funds on behalf of the sub-merchants, deducted fees negotiated between them, then remitted payouts, transmitted reserve funds withheld by a previous processor through which DCRM employed the same scheme from day one showing a pre-existing relationship.) Each of the above items are examples of how DCRM breached §1.5.

## 2. DCRM Failed to Perform Under §1.6 of the Agreement Terms and Conditions.

Pursuant to Section 1.6 of the Agreement Terms and Conditions ("§1.6"), USAG, from time to time, could request financial information from DCRM to determine its current financial condition, and DCRM was required to provide the data, information and statements further requested by USAG within thirty (30) calendar days, or sooner, as reasonably requested by USAG. (*See* T.E. 6.) Simply stated, DCRM understood, and agreed, under this provision that it was being underwritten based on the information and documentation it provided (i.e., its business practices exclusively involved the sale of TruCash and prepaid cards.)

As set forth in greater detail above, although USAG requested that DCRM provide all information related to its sub-merchant relationships, DCRM failed to timely provide all such information related to its sub-merchants when requested, including with respect to some records and information that were not initially provided until after the initiation of this case, and other records and information that have never been produced.

## 3. DCRM Failed to Perform Under §2.2 of the Agreement Terms and Conditions.

Section 2.2 of the Agreement Terms and Conditions ("§2.2") provides that DCRM was required to provide USAG with immediate notice of intent to change the basic nature of its business, including selling any products or services not related to its current business, and provides that failure to provide such notice is a material breach, and is a sufficient grounds for USAG to immediately terminate the Agreement. (*See*

22

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-6901

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-6901

T.E. 6.) In other words, DCRM was required to provide USAG with immediate notice of intent to change any part of its business practices.

DCRM failed to immediately notify USAG with respect to any of its business relationships with sub-merchants involved with Tribal Lending, the identity of any third-party sub-merchants with whom it had a contractual relationship, any of the Sub-Merchant Agreements, the subject matter of any of the Sub-Merchant Agreements, or the parties to any of the Sub-Merchant Agreements. That is because DCRM failed to disclose any of that information for the first time until August 2019, which is what occurred notwithstanding Ms. Fletcher's trial testimony that Ms. LePage from DCR's Compliance Department would have communicated to USAG, or its affiliates, each time they brought on new sub-merchants. (*See* 8/30/22 R.T., at pg. 42:16-24.) However, although Ms. Fletcher testified that she assumed Ms. LePage would have done so in an email, she didn't actually know. (*See* 8/30/22 R.T., at ppg. 42:25 to 43:1.) As such, and as with numerous other aspects of her trial testimony, Ms. Fletcher's assertion is unsupported by any evidence whatsoever.

Each of the foregoing items constitutes a change to the basic nature of DCRM's business. Each instance in which DCRM failed to provide immediate notice of one of the above constitutes a separate breach of §2.2.

### 4. DCRM Failed to Perform Under Section 6.1 of the Debit Supplement.

Section 6.1 of the Debit Supplement ("§6.1") prohibits DCRM from entering into an any agreement requiring the transfer of any payments or proceeds from transactions covered by the Debit Supplement to the custody or control of any third party. §6.1 also prohibits DCRM from assigning any rights, including the right of payment under the Debit Supplement and non-compliance is voidable by USAG, or allowed USAG to immediately terminate the Agreement. DCRM assigned its rights under the Debit Supplement to sub-merchants. DCRM assigned payments owed to DCRM under the Debit Supplement to sub-merchants.

DEFENDANT/COUNTER-CLAIMANT U.S. ALLIANCE GROUP'S FINAL BRIEF

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-8901

In sum, DCRM breached the foregoing provisions setting forth events of termination because (1) it defaulted in performing multiple provisions of the Agreement (each of which was a "Merchant Default"), (2) it made numerous misrepresentations to USAG, and (3) it failed to abide by the Card Brand Rules and applicable federal criminal statutes. The Processing Statements and DCRM's written agreements with the sub-merchants reflect DCRM acted as an unauthorized PayFac. In short, DCRM breached the Agreement for each of the same reasons that it also failed to perform under the Agreement.

**D.  USAG Has Established That It Was Damaged.**

USAG acted within its rights under the Agreement in charging DCRM an Early Termination Fee. (*See* Cheikha Dec. at ¶ 100, and Agreement, at § 5.3.) Based on the methodology set forth in the Declaration of Caroline Rutenbar (ECF No. 252) (hereinafter, the "Rutenbar Dec."), the total of the early termination fee due to USAG is $2,464,343.20. (*See* Rutenbar Dec., at ¶¶ 16.a, 16.b, 16.c, and 16.d, and T.E. 56.)

USAG also acted within its rights under the Agreement in retroactively increasing the fees. (*See* Cheikha Dec. at ¶ 105, and Agreement, at § 2.4, titled "Change in Terms," § 3.2, titled "Merchant Assumptions," and § 3.6 of the Debit Supplement, titled "Adjustments to Account"). Based on the methodology set forth in the Rutenbar Dec., USAG modified its pricing to an additional $1,137,759.22. (*See* Rutenbar Dec., at ¶¶ 23; *see also* T.E. 56.)  Had USAG known that DCRM aggregated transactions for Tribal Lending products, the pricing USAG charged DCRM would have been much higher, based on the price that USAG offers similar merchants and of which USAG is charged by its sponsor banks. (*See* Cheikha Dec., at pg. 26:10-13.) The DCRPay processing statements DCRM generated and sent to the sub-merchants show that DCRM charged its sub-merchants at or above the rates that USAG planned to charge to DCRM.

USAG based its retroactive increase to DCRM based on this as well because DCRM would still make a profit, but it would not receive the lion's share of the profit.

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-6901

1   With the TLEs hidden, DCRM was able to upsell USAG's rates, and make 2-3% on
2   the transactions.  USAG charged DCRM roughly 3%, but USAG's costs are about
3   2.5%, so USAG made a ½%, while DCRM made 2-3%.  And while making most of
4   the profit, DCRM had no liability for losses or chargebacks, and did not have to
5   perform and operate any of the steps in the convoluted payment processing ecosystem.
6   Thus DCRM took all the profit, but performed none of the necessary acts, and carried
7   no liability to upstream entities, like the bank, processor, and Card Brands.

8       This also proves USAG's unjust enrichment claim because DCRM was making
9   more than USAG was, despite that it played a small role in the scheme.

10      Offsetting the $1,770,061.74 in the Reserve Account leaves $1,832,040.76
11  owed to USAG. (*See* Cheikha Dec. at pg. 42:10-12, and *see also* T.E. 56.)

12      USAG also established its rights to hold money in lieu of pending liabilities as
13  authorized under the agreement. (See T.E. 1, at pg. Exhibit 1-29, at section 5.4; see
14  also page Exhibit 1-31, at section 2.1; see also page Exhibit 1-24, which states in part
15  that after termination of the Agreement, API may hold funds for "the period necessary
16  to secure the performance of Merchant's obligations under this Agreement.") Mr.
17  Cheikha stated that even Blue Novis's money was subject to regulatory action. (See
18  8/31/22 R.T., at ppg. 14:24 to 15:11.)

19      Mr. Cheikha testified that he had been fined nine years after the triggering event
20  in one instance.  (*See* 8/30/22 R.T., at pg. 161:13-23)

21      Mr. Cheikha also testified that he received a subpoena from the IRS, which
22  triggered the need to withhold amounts including other actions, such as limiting the
23  communication with DCRM.  (*See* 8/31/22 R.T., at ppg. 10-11; 23-18.)

24  **XIII.  USAG Has Established Its Promissory Fraud Claim Against DCRM.**

25      The elements of promissory fraud are: (1) a promise without any intention of
26  performing it; (2) intent to deceive or intent to induce the party to whom it was made
27  to enter into the transaction; (3) reasonable reliance by the party to whom it was made;
28  (4) the party making the promise did not perform; and (6) the party to whom the

promise was made was injured. *Ticketmaster L.L.C. v. Prestige Entm't, Inc.*, 306 F.Supp.3d 1164, 1178 (C.D. Cal. 2018).

### A.    USAG Has Established The Misrepresentation By DCRM.

As set forth above, the information and documents that DCRM disclosed to Vantage for initial underwriting for TruCash was incomplete, incorrect or false. The above omissions of information and documentation by DCRM were significant, in part, not only because they pertained to DCRM's actual business practices, they also pertained to the true manner in which DCRM used DCRM's USAG Merchant Account, and they impacted the manner in which the merchant account was underwritten. The foregoing is underscored by the fact that approximately 98% of the transactions processed using DCRM's USAG Merchant Account were transactions related to Tribal Lending. (*See* T.E. 70, at USAG EX 70-43.)

Thereafter, the documents and information provided by DCRM to USAG clearly reflected DCRM was knowingly engaging in those transactions. That knowledge was underscored during Ms. Fletcher's trial testimony, when she testified that she understood Blue Novis's business prior to submitting them to the processor. (*See* 8/30/22 R.T., at ppg. 36:2-4.) Ms. Fletcher also testified that she knew that the sub-merchants that processed through USAG did "Tribal Lending," and when asked if she knew that transactions were being submitted to USAG related to the sub-merchants, Ms. Fletcher testified that she knew "they use Tribal Lending," and just Tribal Lending. (*See* 8/30/22 R.T., at pg. 36:14-23.)

DCRM also never changed its behavior, which forced USAG to terminate the Agreement and any business relationship with DCRM.

### B.    USAG Has Established DCRM's Knowledge Of Falsity.

There is no question that DCRM had knowledge of the falsity as detailed above.

### C.    USAG Has Established DCRM's Intent to Defraud.

DCRM was a shell company set up only to facilitate contracts with companies in the U.S. (*See* 8/30/22 R.T., at ppg. 8;9; 24-3.)

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-6901

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-8901

DCRM's intent to defraud is best evidenced by the Processing Statements. The Processing Statements clearly reflect that the intentional acts were ongoing from the moment DCRM applied to USAG for processing services. For some reason whoever DCRM was previously submitting the sub-merchants' transactions through had been compromised in some way. Hence why it applied to USAG at all.

**D.    USAG Has Established Its Justifiable Reliance.**

USAG justifiably relied on DCRM's representation that its business practices exclusively involved the sale of TruCash. This is evidenced by the Agreement's Application which shows USAG agreed to allow DCRM to process transactions solely related to TruCash and underwrote solely that business operation. This was what USAG believed it was opening a merchant account for DCRM.

**E.    USAG Has Established Resulting Damages.**

As set forth above, $3,602,102.42 is owed to USAG.

**XIV.    USAG Has Established Its Claim For Breach Of Contract Against Ms. Fletcher.**

On or about May 25, 2018, Ms. Fletcher unconditionally agreed, in writing, to guarantee all of DCRM's obligations and duties under the Agreement (the "Guaranty"). (*See* T.E. 6.) Ms. Fletcher defaulted on the Agreement, and the Guaranty, by failing to remedy DCRM's breaches thereof as alleged above, and to pay USAG all amounts owed by DCRM to USAG resulting therefrom (i.e., the $1,832,040.76 referenced above). Moreover, as set forth above, USAG has performed all conditions and promises required of it to be performed under the Agreement and the Guaranty.

The Agreement provides for the payment of attorneys' fees and costs incurred to enforce it. USAG retained Global Legal Law Firm to represent it in this matter. As such, USAG is entitled to an award of its reasonable attorneys' fees and costs according to proof at trial.

**XV.    DCRM Cannot Establish Its Breach of Contract Claim Against USAG.**

**A.    DCRM Cannot Establish That It Performed Under The Contract.**

27

DCRM failed to perform under §1.5, §1.6, §2.2, and §6.1 for the same reasons set forth above describing how DCRM breached those same provisions.

## B.   DCRM Cannot Establish That USAG Breached the Agreement.

### 1.   DCRM Cannot Establish That USAG Breached the Agreement by Not Returning the Funds in the Reserve Account.

DCRM alleges that USAG breached the Agreement by not returning the reserve funds. However, as set forth above, USAG acted within its rights under the Agreement in not returning those funds to DCRM, as DCRM defaulted in performing §1.5, §1.6, §2.2, and §6.1. Each of those instances constitutes a "Merchant Default" thereunder as are they tantamount to misrepresentations made by DCRM.

DCRM also violated the Card Brand Rules and applicable federal criminal laws. Each of those items constitutes an "event of termination" under the Agreement. As provided under the Agreement, in the event of termination for any of the above items, "The Early Termination Fees shall apply as outlined in the Agreement."

Also, §2.2 provides that a violation thereon by DCRM is sufficient ground warranting USAG's immediate terminate of the Agreement. And §5.3 mandates that if DCRM breaches the Agreement prior to the end of any Processing Program, including for failure to cure any default under the Agreement, DCRM shall pay a Program Early Termination Fee. Therefore, USAG was within its rights to assess an Early Termination Fee against DCRM following immediate termination. And the Early Termination Fee far exceeded the amount of wrongfully withheld reserve funds claimed by DCRM. Furthermore, USAG was authorized to offset the Early Termination Fee and any charges due by DCRM to USAG from any funds held in reserve.

USAG is entitled to $2,464,343.20 for an Early Termination Fee, and $1,137,759.22 for offsets for fee increases, in the amount of $3,602,102.42. Offsetting the $1,770,061.74 in the Reserve Account (which are the damages DCRM is seeking pursuant to its breach of contract claim) *leaves $1,832,040.76 owed to USAG*.

### 2.   DCRM Cannot Establish That USAG Breached the Agreement

DEFENDANT/COUNTER-CLAIMANT U.S. ALLIANCE GROUP'S FINAL BRIEF

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-8901

**by Terminating the Agreement Immediately With Cause.**

In DCRM's Complaint, it alleges that USAG's immediate termination a breach of the Agreement. However, USAG provided ample notice and an opportunity to cure, which DCRM did not take. (*See* 8/30/22 R.T., at pg. 52:13-23.)

Further, even absent that USAG discovered that DCRM was engaged in conduct, Tribal lending, and that violated USAG's agreement with its sponsor bank. USAG also discovered that DCRM was effectively committing money laundering violations and other potential crimes requiring USAG to terminate immediately.

§2.2 clearly allowed USAG to immediately terminate the Agreement if DCRM failed to provide USAG with immediate notice of intent to change the basic nature of its business, including selling any products or services not related to its current business. DCRM clearly failed to provide USAG with any such timely notice for the reasons articulated in greater detail above, pursuant to which USAG established that DCRM failed to perform under the Agreement. However, equally as significant as that is that DCRM's failure to provide USAG with any such timely notice allowed USAG to immediately terminate the Agreement, which it did.

Moreover, DCRM's breaches of §6.1 of the Debit Supplement based on DCRM's assignments of its rights for the reasons set forth herein are additional grounds upon which USAG could immediately terminate the Agreement and the Debit Supplement because DCRM assigned its rights to sub merchants, including without limit Blue Novis.

Contrary to the above items, DCRM's argument is based on the application of §5.2 of the Agreement Terms and Conditions, and assumes the existence of defaults that were curable. However, the nature of DCRM's defaults were not curable, as they consisted of material omissions and misrepresentations related to its business

**C.    DCRM Cannot Establish That It Was Damaged.**

Ms. Fletcher testified that she did not have an assignment from the merchants to pursue the funds that USAG held, which was all of the damages that DCRM sought.

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(808) 846-6901

1 | (*See* 8/30/22 R.T., at pg. 54:2-18;  (*See* 8/30/22 R.T., at ppg. 67:23 to 68:5.)

2 |     Ms. Fletcher only vaguely stated that Ms. Fletcher is "obligated" to get the

3 | money from USAG to pay to the sub-merchants. (*See* 8/30/22 R.T., at pg. 67:6-8.), but

4 | also stated that the sub-merchants would sue USAG if Ms. Fletcher was successful (

5 | (*See* 8/30/22 R.T., at pg. 54:21-23.)

6 |     Ms. Fletcher ultimately stated that not a penny was owed to her or DCRM and that

7 | she would give all of the approximate $1.7 million she was owed to the sub-merchants.

8 | (*See* 8/30/22 R.T., at ppg. 68:4-5.)  Ms. Fletcher sought to add that she did pay some

9 | reserves and that was probably one hundred thousand owed to her.   (Ibid.)  But Ms.

10 | Fletcher provided no evidence of that at trial.  That would also contradict her statement

11 | that she did not pay reserves.  Further, Ms. McCall stated that she did not receive any

12 | reserve funds from DCRM. (*See* 8/31/22 R.T., at ppg. 106:14-18; 110:1-5; 112:14-17.)

13 |     The amount of the funds in the Reserve Account against which it offset the Early

14 | Termination Fees and the fee increases consumed all the funds in the Reserve Account,

15 | *it left a balance of $1,832,040.76 owed to* USAG. However, since the foregoing

16 | amounts to which USAG is entitled was greater than the funds in the Reserve Account,

17 | DCRM simply cannot establish that it has been damaged.

18 |     DCRM failed to establish the amount that USAG held in Reserve. There was no

19 | evidence of the amount that USAG ever held.   (*See* 8/31/22 R.T., at ppg. 37:2-25)

20 | because DCRM could not prove the amount that USAG had to offset for chargebacks.)

21 | Thus, even if some amount is owed, it's uncertain as to what that is.

23 | Dated:  October 3, 2022           **GLOBAL LEGAL LAW FIRM**

25 |

26 | By: _____*/s/ James C. Huber*_____

                 Christopher R. Dryden

27 |                  James C. Huber

                 Attorneys for Defendant

                 U.S. ALLIANCE GROUP, INC.

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-8901

DEFENDANT/COUNTER-CLAIMANT U.S. ALLIANCE GROUP'S FINAL BRIEF

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-6901

## CERTIFICATE OF SERVICE

I, JAMES C. HUBER, hereby certify that on October 3, 2022, I caused to be electronically filed **DEFENDANT/COUNTER-CLAIMANT U.S. ALLIANCE GROUP'S FINAL BRIEF**, with the Clerk of the Court by using the CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.  Participants in the case who are not registered CM/ECF users will be served by mail, electronic mail, or by other means permitted by the court rules.

Dated:  October 3, 2022                    GLOBAL LEGAL LAW FIRM

By:  _/s/ James C. Huber_
James C. Huber
Attorneys for Defendant
U.S. ALLIANCE GROUP, INC.

31
DEFENDANT/COUNTER-CLAIMANT U.S. ALLIANCE GROUP'S FINAL BRIEF.